```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       OCALA DIVISION

 3   UNITED STATES OF AMERICA,        Ocala, Florida

 4        Plaintiff,                  Case No. 5:23-cr-91-JA-PRL

 5   -vs-                             September 19, 2023

 6   MATTHEW ALLEN GAHAN,             1:31 p.m. - 2:49 p.m.

 7        Defendant.                  (Digitally Recorded)

 8   _____

 9       DIGITALLY RECORDED ARRAIGNMENT AND DETENTION HEARING
            BEFORE THE HONORABLE PHILIP R. LAMMENS
10               UNITED STATES MAGISTRATE JUDGE

11                    A P P E A R A N C E S

12   GOVERNMENT COUNSEL:

13     HANNAH NOWALK, ESQUIRE
       United States Attorney's Office
14     35 SE 1st Avenue, Suite 300
       Ocala, FL 34471
15
     DEFENSE COUNSEL:
16
       CHRISTINE BIRD, ESQUIRE
17     Office of the Federal Public Defender
       201 SW 2nd Street, Suite 102
18     Ocala, FL 34471

19   OFFICIAL COURT REPORTER:

20     Katharine M. Healey, RMR, CRR, FPR-C
       PO Box 56814
21     Jacksonville, FL 32241
       Telephone: (904) 301-6843
22     KatharineHealey@bellsouth.net

23

24            (Proceedings recorded by electronic sound recording;
                        transcript produced by computer.)
25
```

I N D E X

PAGE

DEFENDANT ADVISED OF RIGHTS, CHARGE, PENALTIES,
SPECIAL ASSESSMENT AND FORFEITURE PROVISION.............. 3

DEFENDANT ENTERS PLEA OF NOT GUILTY..................... 6

GOVERNMENT'S ARGUMENT FOR DETENTION..................... 7

DEFENDANT'S ARGUMENT AGAINST DETENTION.................. 25

GOVERNMENT'S ORAL MOTION FOR DETENTION GRANTED.......... 49

DEFENDANT'S WITNESS:

**CATHLEEN MATHIS**

  DIRECT EXAMINATION BY MS. BIRD......................... 31

  CROSS-EXAMINATION BY MR. BODNAR....................... 35

  REDIRECT EXAMINATION BY MS. BIRD...................... 43


E X H I B I T S

ADMITTED IN EVIDENCE

  GOVERNMENT'S EXHIBIT 1 & 2............................. 8

1    P R O C E E D I N G S

2    September 19, 2023                                1:31 p.m.

3                          -  -  -

4         THE COURT:  This is Case Number 5:23-cr-91, *United*

5    *States vs. Matthew Allen* -- is it "Guh-han"?

6         THE DEFENDANT:  "Gan."

7         THE COURT:  "Gan"?

8         THE DEFENDANT:  Yes.

9         THE COURT:  Mr. Gahan is represented by Ms. Bird.

10   Ms. Nowalk represents the United States and is joined by Agent

11   Turner.

12        The case was set for a detention hearing.

13        Since we last convened on the criminal complaint, a

14   federal grand jury has returned an indictment.

15        Ms. Bird, do you have a copy of the indictment?

16        MS. BIRD:  Yes, Your Honor.

17        THE COURT:  The indictment charges on or about

18   September 13th, 2023, in the Middle District of Florida --

19   that's the judicial district you are in -- and elsewhere, the

20   defendant, Matthew Allen Gahan, did knowingly possess any

21   material that contains an image of child pornography, that is,

22   a visual depiction, including photograph, film, video, picture,

23   and computer and computer-generated image and picture, of

24   sexually explicit conduct, where the production of such visual

25   depiction involved the use of a minor engaging in sexually

1    explicit conduct that had been mailed and shipped and

2    transported using any means and facility of interstate and

3    foreign commerce in and affecting interstate and foreign

4    commerce by any means, including by computer, and that was

5    produced using materials that had been mailed and shipped and

6    transported in and affecting interstate and foreign commerce by

7    any means, including by a computer, and an image of child

8    pornography involved a prepubescent minor and a minor who had

9    not attained 12 years of age.

10         That conduct would be in violation of Title 18 of the

11   United States Code, Section 2252A, subsection (a)(5)(B) and

12   (b)(2).

13         In addition, there is a forfeiture provision which

14   would provide for the forfeiture of any property or assets

15   related to the offense, including computer and computer

16   hardware.

17         The potential penalty is not more than 20 years of

18   imprisonment, to be followed by not more than three years of

19   supervised release.  The Court could impose a $250,000 fine.

20   It would impose a $100 special assessment.  If there were

21   victims of the offense the Court would order restitution to the

22   victims.

23         Do you understand what you are charged with and what

24   the potential penalties are?

25         THE DEFENDANT:  Yes, Your Honor.

1       THE COURT:  Let me advise you of certain rights you

2  have.  You do have a right to plead guilty in this case.  If

3  you did that you would be admitting the truth of the charge

4  against you, there would not be a trial, a district judge would

5  find you guilty, and the next court appearance would be a

6  sentencing before a district judge.

7       You have a right to plead not guilty.  If you

8  maintain that plea you have the following rights under the

9  Constitution and laws of the United States:

10      You have a right to a speedy trial.  Typically that

11 means you'll be tried within 70 days of your first appearance

12 or the date of the indictment, whichever is later.

13      You have a right to a public trial and to be tried by

14 a jury of 12 jurors.  They must all unanimously agree on your

15 guilt before you can be convicted.

16      You are presumed innocent.  The United States would

17 have to prove your guilt beyond a reasonable doubt.

18      You have a right to confront and cross-examine the

19 government's witnesses and to challenge the government's

20 evidence, to present your own evidence and your own witnesses,

21 and to compel the attendance of your witnesses.

22      You have a right to testify at trial, but you also

23 have a right to remain silent.  The choice to testify would be

24 up to you.

25      If you are convicted you have 14 days to appeal from

1  the date the district judge enters judgment against you.

2          Do you understand those rights?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Ms. Bird, is there any reason why your

5  client should not enter a plea at this time?

6          MS. BIRD:  No, Your Honor.

7          THE COURT:  And how does he plead?

8          MS. BIRD:  Not guilty.

9          THE COURT:  The case is assigned to Judge Antoon, so

10  it will be set for his November trial term beginning

11  November 1st, 2023.

12          The criminal status conference is October 19th, 2023,

13  at 10 a.m.

14          And I'll issue Judge Antoon's standard criminal

15  scheduling order, which will provide for the exchange of

16  discovery and set other important dates.

17          The case was also set for a bond hearing.  The

18  government requested detention.  Generally the government, in

19  order to obtain detention, would have to show by a

20  preponderance of the evidence that you're a risk of flight, or

21  by clear and convincing evidence -- a slightly higher

22  standard -- that you are a danger to the community.

23          Ms. Nowalk, are you prepared to go forward?

24          MS. NOWALK:  Yes, Your Honor.

25          THE COURT:  Ms. Bird, you continue to seek a bond,

1   correct?

2           MS. BIRD:  Yes, sir.

3           THE COURT:  All right.

4           Ms. Nowalk, you can proceed.

5           MS. NOWALK:  Thank you, Your Honor.

6           Your Honor, the United States moves for detention

7   pursuant to 18 USC 3142 (f)(E)(i) -- or, excuse me,

8   (f)(1)(E)(i), which is because this is an offense that is a

9   felony involving a minor victim.

10           We also move for detention under 18 USC, Section 3142

11   (f)(2)(B) because there is a serious risk that the defendant

12   will obstruct or attempt to obstruct justice if he is released.

13           The factors considered in (g)(1), first going through

14   the nature and circumstances of the offense and the seriousness

15   of this conduct, I would like to admit two documents into

16   evidence, Your Honor.  The first is the Master Affidavit in

17   support of the search warrant application.  And the second one

18   will be the Incident Report from a 2019 incident involving the

19   defendant and a 14-year-old boy while the defendant was an

20   adult at the time.  And I move those exhibits into evidence as

21   Exhibit 1 and 2.

22           THE COURT:  Ms. Bird.

23           MS. BIRD:  Your Honor, I think they're admissible for

24   the purpose of this hearing.

25           THE COURT:  All right.  I agree.  They'll be

1   admitted.

2        (Government's Exhibits 1 and 2 admitted in evidence.)

3            MS. NOWALK:  May I approach?

4            THE COURT:  Yes.

5            MS. NOWALK:  So first, with regard to the serious

6   nature of this offense, I looked to the guidelines that the

7   defendant could qualify for under his conduct so far in this

8   case.  And again, as mentioned in the previous hearing, we have

9   only been able to do a preliminary review of the forensic

10  analyst -- or analysis, excuse me, in this case.  The FBI needs

11  to do a more thorough review that we're still waiting on, and

12  that also is one of the reasons why we're concerned for the

13  attempt to obstruct justice, but I will get into that in a

14  moment.

15          So just from the preliminary review that we've been

16  able to do so far, under the guidelines we have enhancements

17  based off of prepubescent minor victims that is reflected in

18  the indictment and in the complaint that the five videos found

19  the same day as the search warrant included sexual content

20  involving prepubescent minor boys.

21          There's also an enhancement for distributing child

22  pornography with the intent to receive it in exchange.  And

23  what we have is in the Exhibit 1 that I had provided Your

24  Honor, the Master Affidavit, on page 9 we have quotes from the

25  dark web in which a user name that we were able to connect to

1   the defendant based off of an email address and a Snapchat

2   account that he provided under this user name to other users on

3   the dark web, it was linked back to Mr. Gahan.  And so that's

4   how we were able to connect him.

5        We also seized his phone during the search warrant on

6   September 19th, and his phone had the email and the Snapchat

7   account on the phone.  The Snapchat account was actually open

8   to the account that links into the dark web user names.  So

9   that's how we were able to connect him.

10        But going back to conversations that were had on the

11  dark web with the defendant, or at least someone using his user

12  name, he indicated, on page 9, that he -- this other user he

13  was discussing child pornography with him was -- he says,

14  quote, "Oh my God, you're my new best friend.  We have so much

15  stuff to post back and forth to surprise each other.  We should

16  definitely because wedgies are my favorite thing and it's

17  scarce here."

18        And this is in response to a message that the user --

19  the other user sent saying that he -- to paraphrase, that he

20  saw his wedgie stuff and that he also has an archive of his own

21  that he wants to share.

22        And so it shows that the distribution of child

23  pornography on the dark web was -- the defendant's intent was

24  to obtain some in return; that is, a trading exercise.

25        There's also on page 27 of Exhibit 1 when a user name

1   connected to the defendant said, quote, "I was trying to have a

2   good time and IRL and you were continuously bugging me about

3   sending stuff as if I was bound to send you stuff because I

4   have priorities and being on here and sending vids out to

5   people isn't one of them.  I seriously don't get vids back and

6   then I feel like I waste my energy when I could be trading via

7   online finding better stuff worth posting for us here."

8           And so again, based off of that comment that he made

9   on the dark web, it suggests, and I submit to Your Honor that

10  it means that the defendant wanted child porn in exchange for

11  the child porn that he was distributing.

12          There is also an enhancement with regard --

13  potentially an enhancement with regard to giving a minor child

14  porn.  It is unclear from the nature of the conversations that

15  the defendant had with another user on the dark web, but the

16  copy that I introduced into evidence is redacted, and so the

17  redacted name of the individual that the defendant was most

18  presently talking to on the dark web within this search warrant

19  affidavit discusses how he has parental controls on his

20  devices.

21          And so we can look at the page 20 of Exhibit 1.

22  The -- this user with the blacked-out name says, "I'm waiting

23  for my dad to approve the download."  And then they discuss how

24  the defendant was going to help him keep his information

25  private and help him get around the parental controls.

1      On page 21 the defendant's user name says, "Yeah,

2  parental restriction are really weak.  You can do whatever you

3  want.  They can't see what you're doing or saying.  At most the

4  restrict" -- they -- "the restrict the time on your phone and

5  restrict what you can search up.  If you're allowed to buy

6  stuff and if apps can use your phone slash audio, you're fine."

7      So with regard to that idea that this person he's

8  talking to and wanting to trade child pornography with has

9  parental restrictions on his devices, it does suggest that this

10  person could be a minor.  This person also talks about how he

11  has a school crush.  He discusses that with the defendant.

12      So these conversations have this circumstantial

13  evidence showing that this could potentially be a minor.

14  Certainly that investigation is still pending into the identity

15  of that individual, which is why his name's blacked out on the

16  redacted copy.

17      We also have an enhancement for sadistic images.  The

18  defendant prevalently discusses in the dark web and in

19  Exhibit 1, the affidavit, his fetish for wedgies.  He says that

20  he posts his content on the dark web in order to provide

21  awareness of this fetish.  And that's the fetish that he and

22  this other user bond over in those initial conversations that I

23  read earlier.

24      Now, this fetish, he says, is something he likes

25  because -- on page 26 -- he says that, in that user name that's

1    attributed to him, that he likes the discomfort on the little

2    boys's faces.  And so that suggests that he likes the pain

3    inflicted.

4           Also, going back to that other user, his name is

5    blacked out.  The other user just comments about a page called

6    "Their Pain, Our Gain" in reference to a wedgie place in which

7    they can obtain child pornography.

8           So clearly his interest in this material is not just

9    for sexual gratification, but he receives sexual gratification

10   based off of, as he indicated, their discomfort.

11          Also, on page 26 he talks about a video in which a

12   child is hung by a tree in a wedgie and he says -- let me find

13   it.  One moment.  I apologize.  I believe it's not on this

14   page, but it's on another page.  And I will find it in a

15   moment.  It's page 24.  There it is.

16          So on page 24, the defendant's user name indicates,

17   "I have a really good video of a hanging wedgie made by yours

18   truly, but because they're around this school I am afraid

19   posting it would possibly get it to be identified, which makes

20   me scared."

21          He goes on to indicate that this person, quote, "Sort

22   of stuck in it, which sort of turned me on even more.  Shame on

23   me, I know.  I do feel bad.  But his cameraman slash friend

24   ended stream really fast to help him when it hurt so I never

25   knew how it turned out.  I'm hoping they got a good rip off."

1       So again, this language indicates that the defendant

2  finds pleasure in other people's pain, which is an enhancement

3  for sadistic images.

4       There's also an enhancement, of course, for the use

5  of a computer, as these images were located on a computer, and

6  the enhancement for 600-plus images.  While the FBI is still

7  reviewing the hard drives that they discovered in the

8  defendant's bedroom on September 13th, so far they have already

9  been able to confidently relay to me that it is well over 600

10  images that they have been able to identify.

11       And in addition to that, on the dark web alone, what

12  they've received from the law enforcement agency was 120 images

13  that the defendant made posts of on the dark web of child

14  pornography.  He made well over a hundred more posts that were

15  not child pornography, but after sifting through the images,

16  the FBI were able to find 120 images that the defendant posted

17  to the dark web.  So we know he's in possession of a large

18  quantity.  There's also --

19       THE COURT:  Excuse me.

20       MS. NOWALK:  Oh, yes, Your Honor.  Oh, did you have a

21  question?

22       THE COURT:  Yes.  Just pause.

23       MS. NOWALK:  Oh, yes, Your Honor.

24       THE COURT:  Sorry.  So you said over 600 images have

25  been identified on devices obtained from the defendant?

1    MS. NOWALK:  Yes, Your Honor.  Specifically, the

2  device that brought forth the complaint and the affidavit --

3  or, excuse me, the indictment today, which is the hard drive

4  that said it's made in Thailand, on that hard drive is the

5  virtual machine, and that virtual machine, which is just an

6  application to upload kind of a new desktop computer on which

7  the defendant has all of this child pornography.

8         And I've spoken with my agent, Special Agent Caleb

9  Turner, and he told me that just files alone, not even

10  accounting for the different images that a video could possess,

11  but just files alone of child pornography, there are over 600

12  that he is able to identify.  And he's still going through

13  those to see to what extent we could have more.

14         THE COURT:  And then over 120 images are associated

15  with the user name or user names associated with the defendant

16  that were posted online?

17         MS. NOWALK:  Yes, Your Honor.  Specifically, I

18  believe that is just "SoulSoldtoHell" user name on Website A,

19  which is noted in the Master Affidavit of Exhibit 1.

20         THE COURT:  So that's potentially distribution, but

21  it is not currently charged in the indictment?

22         MS. NOWALK:  Exactly, Your Honor.  So we have only

23  charged him by virtue of the indictment -- the grand jury

24  charged him today -- and arrested him on a complaint for the

25  five videos that were found in that preliminary scan of his

1     computer on the day of the search warrant.

2            But subsequent to that they have already located so

3     much more evidence that could potentially bring forth a

4     superseding indictment for different charges of distribution --

5     or of production, which I'll get into in a moment as well.

6            And so while this specific charge does not carry a

7     presumption of detention, there are potential charges that we

8     are -- we are investigating that could potentially add a

9     presumption, to include the production count, which I'll

10    discuss more of what kind of evidence of what we've already

11    found and what kind of evidence we're looking into.

12           THE COURT:  Okay.  Go ahead.

13           MS. NOWALK:  So, yes.  And also, they found some new

14    videos.  And just to kind of apprise the Court of some more

15    egregious-natured child pornography videos that were found on

16    this device made in Thailand, so affecting interstate commerce,

17    they found a video entitled "12-year-old Australian brothers."

18    In this video there are three prepubescent boys engaging in

19    oral and anal penetration on one another.

20           There's also a video within a folder entitled "Best

21    Dad."  And the video description that I received from my agent

22    is that it's about a 10- to 11-year-old boy with a man, who's

23    approximately 40 years old, engaging -- both of them are

24    engaging in oral and anal penetration on one another.

25           And so that's the -- more of the type of videos that

1   they are locating on the defendant's devices.

2          Also, we have evidence on the dark web of production.

3   And so we have page 24.  Again, as I read earlier, there's the

4   video he referenced about the boy hanging in the tree.  He

5   said, quote, "I have a really good video of a hanging wedgie

6   made by yours truly."

7          And so whether he's boasting and it's not really

8   produced by him or it is produced by him, there's certainly

9   some evidence we wanted to look into further to see if he is

10  producing child pornography.

11         Also on the same page, the above post that he made,

12  the defendant is discussing how it's, quote, "hot summer."  He

13  said, "Boys left and right jumping into the idea of giving

14  their friend a wedgie or themselves a wedgie, and my luck's

15  been insane.  Ball popping out of undies.  Boys asking for more

16  dares, enjoying their wedgies, et cetera.  I would be here all

17  day explaining the stories.  It's like every other week I would

18  need a new updated trailer of the madness I have been

19  capturing."

20         So his "I have been capturing" quote would suggest,

21  again, that he is producing.

22         Also, in reviewing the virtual machine that's on the

23  hard drive made in Thailand, we have a screenshot that the FBI

24  found of what appears to be some type of video call.  And it's

25  not -- it's not a FaceTime call, but to give the Court kind of

1    an analogy to understand the image, it's as though the

2    defendant were on like a FaceTime call and he has a thumbnail

3    image of himself in the corner.  As common with that type of

4    video call, there's a thumbnail version of the defendant's

5    face, and the FBI was able to recognize the defendant's face in

6    that thumbnail.

7              And then posted in the screenshot of the call is a

8    boy who the FBI described as approximately 13 to 14 years of

9    age.  He has one hand on his exposed, erect penis, which is

10   consistent with masturbating.

11             So in that still image alone, the evidence suggests

12   that there's some type of video call where the defendant was

13   engaging with this individual and the defendant took a

14   screenshot of it and captured and produced that child

15   pornography.

16             We also have on the dark web and on that virtual

17   machine within that hard drive videos and images with language

18   saying "wedgie production," "wedgie Galaxy," or "wedgie storm"

19   as watermarks across still images or across -- like beginning

20   videos of child pornography.

21             And so on a "wedgie production" video, it's entitled

22   "The Trailer."  And this is something that was found within the

23   virtual machine, and it's a compilation of multiple clips of

24   videos as though it were a movie trailer showing prepubescent

25   boys, approximately eight to ten years old, masturbating on

1    this video.  And again, it has that "wedgie production"

2    beginning of the video entitled "The Trailer."

3           THE COURT:  And "wedgie" is one of the user names

4    that he utilizes?

5           MS. NOWALK:  Yes, Your Honor.  So in the Master

6    Affidavit, Exhibit 1, we see that his user name on three of the

7    dark web websites that were investigated in this case is

8    "wedgie."

9           And clearly he has a very prominent interest in the

10   use of wedgies for sexual gratification, which is wildly

11   discussed -- widely, excuse me, discussed in the affidavit.

12          He also indicates, as I mentioned earlier, that one

13   of his reasons for being on the dark web and posting this type

14   of content was to, quote, bring awareness to this fetish on the

15   dark web.  And he discusses that again with the other user

16   whose name is blocked out for his own privacy in this case

17   since he is not charged at this time.

18          And so while that's something we're still

19   investigating to determine if this "wedgie production" is

20   something that the defendant created himself or something he

21   was able to obtain elsewhere, certainly, like Your Honor

22   mentioned, he identifies himself as "wedgie" in other aspects.

23          And another piece of evidence that we found on the

24   virtual machine suggesting production are multiple lists of

25   what -- we're opening these documents, these files, under the

1  Notepad application on a computer, but there are these files,

2  multiple files, there are at least seven of them, and one of

3  them is entitled "Clients."

4        And opening these files, there are lists of user

5  names, and they are user names for a social media application

6  called Twitch.  And in those user names there are over -- on

7  just the one entitled "Clients," there are approximately 150

8  different Twitch account users listed on that one file.

9        And in parenthesis next to that there are

10  descriptions.  And some of these descriptions say things

11  like -- it says "was fun with cousins, 7 dash 31," "would do

12  stuff, ask," "ask to do for follows," "cute as God's creation,"

13  "active," "likes wedgies," "ask wedgie with friends, 7 dash

14  14," "worth asking," "boy, God actually loves challenges,"

15  "hates it but did," "hot, will do it," "did it for donation,"

16  "hot-ass boy," "hottest lil wedgie doer, 4 dash 16," "cute, did

17  wedgie and snap, 5 dash 6," "would do more wedgies for a dono,"

18  "fake donation worked awesomely," "got in trouble with parents

19  4/6/22," and "best hanging wedgie to date," cutest kid I've

20  seen," and "does wedgie 9YR," suggesting year.

21        So those are some of the types of descriptions that

22  he puts on this file next to user names.  And then one as well,

23  it says "9 dash 10 hottest kid."

24        So these suggest that these are children.  These

25  suggest that he is accessing these user names to obtain

1   pornography, to obtain wedgie content, as he lists "wedgie."

2   In many of these he discusses the attractiveness appeal that he

3   has -- or that these users have, saying "hottest," "cute,"

4   words like that to describe their appearance, and what they're

5   willing to do, and what they're willing to do it for, like a

6   donation.

7           So that -- that list -- and like I said, there are at

8   least ten of those different text files that the FBI has

9   already identified.  And the one that I was most discussing is

10  the one with over like approximately 150 different Twitch

11  account user names and the file was entitled "Clients."

12          So that does suggest that there's some type of

13  producing child pornography, and we are looking into that.  And

14  so potentially there could be a superseded indictment later on.

15  But at least now that's the evidence that we have.

16          In going through other factors to consider for

17  detention, like the seriousness of danger to the community,

18  what we have in Exhibit 2 is a redacted incident report taking

19  out the child's name, but it's from Marion County Sheriff's

20  Office in 2019, and this is June 2019.

21          The incident report indicates that the defendant

22  admitted to touching a 14-year-old boy's penis over the clothes

23  and kissing this boy.  He indicated that they were in some type

24  of relationship when he discussed this with the police

25  officers -- or, excuse me, the deputies at Marion County

1    Sheriff's Office.

2         Also, the 14-year-old boy's father saw the two of

3    them kissing.

4         At the time of June 2019, at the time of this

5    Exhibit 2 incident report, the defendant was an adult.

6         We also have after this incident report, in October

7    of 2019, if we can look at page 17 of the Master Affidavit,

8    which is Exhibit 1, we have the defendant talking about a

9    boyfriend he has.  He said, "I" -- quote, "I have an amazing

10   boyfriend I truly care about.  I like the guy for being him,

11   not the fact he's a bit younger, 14 dash 18.  Not being

12   specific enough, but yeah, it's been great."

13        And he goes on to describe what this boyfriend looks

14   like.  And after researching the DAVID and -- of, excuse me,

15   the boy referenced in Exhibit 2, the 14-year-old boy, the

16   description that the defendant provides of his boyfriend in

17   October of 2019 matches the description of the child he

18   admitted to fondling and kissing in June of 2019.

19        So even after police involvement, it appears that the

20   defendant continued to pursue this individual or someone

21   similar in identifiers to this individual.

22        There are also firearms in the defendant's home that

23   he's residing in.  There was a firearm found in his room, which

24   is where the child pornography was located on the desktop of

25   his computer.  And it's my understanding from the agents that

1  the stepfather in the home also has weapons to which the

2  defendant could have access.

3         And on page 24 of Exhibit 1, the Master Affidavit,

4  there are potentially local victims.  On page 24 I read this

5  quote earlier, but just to kind of read it again and provide

6  context with regard to the potential nature in which this could

7  be local victims, the defendant was talking about the video he

8  posted of the boy hanging in the tree.  And then he said that

9  it was made by, quote, "yours truly, but because they're around

10  this school, I'm afraid posting it would possibly get it to be

11  identified, which makes me scared.  Do you think I should still

12  post it given a bit of time has passed?"

13         So that, and also earlier in that same conversation

14  the defendant said, "I a hundred percent agree with you as well

15  as schools being a prime way for LEO or some other bad people

16  trying to get ahold of these boys."  And that's when he went on

17  to discuss this video that he had but that he's afraid to post

18  because they're around this school.

19         This suggests that it's somewhere within distance

20  that the defendant could access this child.  Potentially these

21  are local victims, again, to which the defendant could access,

22  at least by virtue of producing this video that he claims to

23  have produced and also potentially to tamper with in this case,

24  to obstruct justice, or to otherwise harm these children, to

25  further harm them.

1    We also have prior attempts to evade law enforcement,

2  as depicted in that quote alone that he -- he basically, in his

3  line "that is a prime way for LEO or some other bad people to

4  try to get ahold of these boys," it suggests that he's equating

5  law enforcement to bad people.

6    He says that his use of the dark web and certain

7  email addresses and the way in which he stores his library on a

8  virtual platform or in the cloud-based program is to evade

9  detection of law enforcement.  And that's on page 26.

10    He also indicates that he has his child porn on a

11  virtual machine to, quote, "mask himself" -- or, excuse me, he

12  says to, quote, "mask myself."  And exactly where he said the

13  child porn was is where the FBI found it:  on a virtual

14  machine.

15    So his use of these -- of the dark web, his use of

16  Megalink is safe, he says, on page 26, his use of certain email

17  addresses, a Proton email address that he believes is also

18  safe, these are the shields he uses and admits to using to

19  evade law enforcement and detection.

20    So he has in the past tried to, quote, "mask myself"

21  and otherwise hide himself from being detected by law

22  enforcement.

23    Now, there's a serious concern for obstruction of

24  justice in this case, Your Honor, because as the defendant

25  said, he keeps his child pornography in a virtual cloud-based

1   program.  This type of program can be easily accessible by

2   anyone with internet.  And so we want to make sure that the

3   defendant does not have access to the internet, not only to

4   potentially obtain more pornography or otherwise trade in

5   pornography as he has in the past, but more specifically to

6   this case.

7        As I've mentioned a few times, we are still

8   investigating this case.  We are looking into potential -- you

9   know, potentially more serious charges, potentially charges

10  with minimum mandatory sentences.  Defendant has never been in

11  trouble before, and so seeking, you know, any prison at all in

12  this case would be significant.

13       But what we're looking into, it could be an even

14  greater risk that the defendant would want to obstruct justice

15  and otherwise flee.  And all he has to do, from my

16  conversations with law enforcement, is access the internet and

17  he could wipe those files from our detection.

18       And I hesitate in revealing that to the defendant

19  today in this case, but I do want Your Honor to be apprised of

20  the serious nature in which we want to keep the defendant away

21  from the internet.  Just being in this room, he's around the

22  internet.  Anywhere outside, really, the four corners of the

23  jail cell he would be in access to the internet.

24       He also told Pretrial Services that there are three

25  smart phones in the home.  We only have one of those phones

1   that we seized during this incident.  So that alone shows that

2   there are two other smart phones to which he could have access.

3   Smart phones have internet access, and so we are very concerned

4   about the potential of destruction of evidence in this case.

5          And for all those reasons, Your Honor, we believe

6   that it is appropriate to detain the defendant pending the

7   resolution of this case.

8          He is -- this offense involves many minor victims,

9   potentially local victims.  And there's a serious risk that he

10  will obstruct justice, either the physical just- -- or the

11  physical evidence by deleting it before we're able to access it

12  and archive it in a way that we can use it as evidence against

13  him, and also obstruct justice potentially with tampering with

14  actual victims that could be local.

15         For those reasons we ask that he be detained.

16         THE COURT:  All right.  Thank you, Ms. Nowalk.

17         MS. BIRD:  You ready?

18         THE COURT:  Whenever you are.

19         MS. BIRD:  Oh, okay.

20         Your Honor, as the Court indicated at the beginning

21  of the hearing, this is not a case of presumption, so the

22  government has the burden here, obviously.  The burden for risk

23  of flight is preponderance and the burden for dangerousness is

24  clear and convincing evidence.  The Court would also have to

25  consider whether any reasonable conditions of bond would

1   assuage any concern the Court might have or lessen the risk of

2   flight or the danger -- eliminate the danger to the community.

3          In this case we think that -- that there are at least

4   conditions of release that would allow the Court to release

5   this individual on pretrial release.

6          I'll start with the ties to the community.

7   Significantly, this client has very longstanding ties to the

8   community.  He was born in Marion County.  He went to Harbour

9   View Elementary, Lake Weir Middle School, and Lake Weir High

10  School, where he graduated.  He spent 15 years in the Belleview

11  Baseball League.  He was an excellent student for most of his

12  high school career.  He won presidential academic awards.

13         Currently, although I understand based on the nature

14  of this case he may not be enrolled, but he currently was

15  attending the College of Central Florida.  He was three months

16  away, shy, of a degree.  And he has a local work history at

17  Dunkin' Donuts, Moe's, and Zaxby's.

18         And also, significantly, his entire extended family

19  was born and raised in Marion County.  My mother, father,

20  stepfather, and brother all graduated from Lake Weir High

21  School just like he did.

22         His family owns property.  It's three and a half

23  acres.  He lives with his mom in a house on that property.  His

24  brother lives on that property.

25         And he does not have a passport.  His family doesn't

1    originate from any other state and they don't travel outside

2    the country.  And so he has very significant ties here.

3    Essentially, this individual has no place to go.  He doesn't

4    have any family anywhere else.  So he does have significant

5    ties here.

6            With respect to the seriousness of the offense,

7    although the Court can consider that, the government relied

8    heavily on the guidelines, which, of course, are advisory

9    guidelines.  The Court's not bound by them.  As he currently

10   stands, there's no minimum mandatory sentence.  As currently

11   charged, the maximum penalty is 20 years.  And so although the

12   guidelines are high and elevated, that doesn't necessarily mean

13   that this individual, who has no criminal history, would be

14   facing what the guidelines might recommend in this case.

15           With regard to the danger to the community, I would

16   point out first and foremost that this client has no criminal

17   history.  Of course, that goes to risk of flight also.  There's

18   no indication that he would fly.

19           The offense occurred -- when this offense occurred he

20   was living with -- the family in this case has removed all of

21   the firearms and electronics from his home.

22           And on the three-and-a-half-acre parcel, there are no

23   children who live out there.  It's relatively rural, so it

24   would be away from other people in the community.

25           The house could be subject to a search.  And he can

1   offer third-party custodians who could assist; his mother in

2   particular.  And when his mother is at work, his brother Joshua

3   could monitor him.

4           So with regard to the dangerousness in this

5   particular case, I would point out that most of the conduct

6   that's alleged to have occurred in this instance that's charged

7   in the indictment are offenses that occurred via the use of

8   electronics.  And there is a manner in which to protect the

9   community from the client using these electronics.  But all the

10  electronics from the property have been moved.  Probation could

11  go out there and search that property to determine that they've

12  all been removed.  The internet access could be prohibited at

13  that property.  There's a lot of things that the Court could do

14  to prevent this individual from having access.

15          Also with respect to the seriousness of the offense,

16  I would point out that the government has indicated that it

17  considers -- it's considering the possibility that there was

18  some sort of production, or individual production in this

19  particular case.  And they mention the offense that occurred at

20  the school.

21          And I would just point out to the Court that I

22  reviewed that in the affidavit as well, but that is also

23  subject to the interpretation that this individual sourced

24  those images from the web, and his intent in not posting them

25  was because it might expose the individuals in the videos

1   themselves who were depicting themselves in this wedgie

2   situation.

3          And the issue of whether or not a cop was equated

4   with a bad person, he simply could have -- might have meant

5   that there was a predator out there who was a hands-on type

6   predator and he was trying to protect the community from them.

7          And I bring this up to suggest that these are all

8   possibilities that the government seeks, but they aren't things

9   that are currently charged.  The government's been candid that

10  at this point they don't have the ability to charge him with

11  that, it's just possible things that they think they might be

12  able to charge.  And some of those things, and maybe more of

13  them because I don't have access to the information that the

14  government has, are subject to other interpretation.

15         But at any rate, there's plenty the Court could do in

16  this particular case to prevent any contact with the internet.

17  And the Court could impose the electronic monitoring so that

18  Matthew -- Mr. Gahan's whereabouts would be known at all times.

19  The Court could impose a curfew.  The Court could impose house

20  arrest.  All those things in this particular case are suitable

21  because of the client's remote location, because there's no

22  children on the property, because the property is either --

23  because monitoring is available and because of the cus- --

24  third-party custodian, who we'll present in a minute.

25         The other thing that the Court should be aware of is

1   Pretrial Services has recommended that this individual be

2   released with conditions.  And the way that Pretrial Services

3   comes up with that is they have an actual risk assessment tool

4   based on the charges.  And they rely on that, in part, to

5   determine whether someone should be released.

6           So based on Pretrial Service's -- essentially the

7   government's own assessment of risk in this type of case, it's

8   such that pretrial services may be considered and should be

9   warranted.

10          And with that, if it's okay, I'll call a third-party

11  custodian.

12          THE COURT:  All right.

13          MS. BIRD:  Ms. Mathis, come forward.

14          COURTROOM DEPUTY:  Please raise your right hand.  Do

15  you solemnly swear that the statements you make before this

16  Court will be the truth, the whole truth, and nothing but the

17  truth?

18          THE WITNESS:  I do.

19          COURTROOM DEPUTY:  Have a seat.  Go ahead and state

20  your full name for me, please.

21          THE WITNESS:  Cathleen Mathis.

22          COURTROOM DEPUTY:  Try that again.

23          THE WITNESS:  Cathleen Mathis.

24          **CATHLEEN MATHIS**, **DEFENSE WITNESS**, **SWORN**,

25                          DIRECT EXAMINATION

1   BY MS. BIRD:

2   Q.   Ma'am, what is your relationship to Matthew?

3   A.   I'm his mom.

4   Q.   And where do you live?

5   A.   In Summerfield.

6   Q.   What is the address?

7   A.   6559 Southeast 169th Street in Summerfield.

8   Q.   Can you describe the house and the property?

9   A.   Um, I mean, what are you asking?

10  Q.   What's the size of the property?

11  A.   It's about two acres or so, I believe.

12  Q.   Okay.  And how many houses are on the property?

13  A.   We have our main house and then there's a garage apartment

14  behind the house.

15  Q.   Okay.  Do you have -- have you done something to remove

16  the firearms that were found in the house, on the property?

17  A.   Yes.

18  Q.   Okay.  And where are the firearms now?

19  A.   Right now they're currently at my other son's house.

20  Q.   Okay.  And that's Joshua?

21  A.   Yes.

22  Q.   Okay.  If the Court ordered that they be removed to your

23  ex-husband's house, would you be willing to do that?

24  A.   Yes, ma'am.

25  Q.   Also, the government's indicated that they only seized one

1  of three cell phones that were at the house.  Have you made

2  efforts to remove all of the electronics from the house?

3  A.   I have a cell phone that is protected due to HIPAA because

4  I'm in the medical field and it has to be protected.  It can't

5  just be opened, so it has to be either password or fingerprint

6  opened.  I'm not sure if that's enough protection or not.

7           And my husband has a cell phone that is actually

8  property of his company that it, too, has to be opened with a

9  code that Matthew does not know and I don't know.

10  Q.   Okay.  If the Court ordered it, would you be willing to

11  remove those cell phones from the property?

12  A.   I would make any attempt possible.  Because it is needed

13  for my job.  If it needs to be locked in my car, I mean, I'm

14  willing to do whatever.

15  Q.   Other electronics, are there any other electronics at your

16  home?

17  A.   I have a personal computer that I use for my business that

18  I have to print online labels.  But if that has to be removed,

19  I'm willing to do that.

20  Q.   Okay.  And are there -- is there wifi access at your

21  house?

22  A.   Yes, ma'am.

23  Q.   Okay.  If the Court required, would you be willing to

24  install a land line and get rid of the wifi access while your

25  son's on pretrial release?

1   A.   Yes, ma'am.

2   Q.   And are there any children on your property?

3   A.   No, ma'am.

4   Q.   No kids at all that live in that property?

5   A.   Not on my address, no, ma'am.

6   Q.   All right.  What do you do for a living?

7   A.   I'm a nurse.

8   Q.   And what -- how many days a week do you work?

9   A.   I work a Baylor shift on the weekends, which means I do a

10  double shift Saturday and a double shift Sunday and I'm home

11  Monday through Friday working my own business.

12  Q.   And I'm assuming as a nurse you had to pass some

13  background checks?

14  A.   As a nurse and also as an elementary school education

15  vicary [verbatim], yes, ma'am.

16  Q.   So you have no prior criminal history?

17  A.   No, ma'am.

18  Q.   And would you be willing to serve as the third-party

19  custodian?

20  A.   Yes, ma'am.

21  Q.   As third-party custodian you'd be responsible for getting

22  your son to and from court.  Do you understand that?

23  A.   Yes, ma'am.

24  Q.   And are you able to do that?

25  A.   Absolutely.

1  Q.    Okay.  As the third-party custodian you would be basically

2  monitoring your son.  So you would have to make sure he has --

3  he's compliant with all the court orders.

4  A.    Yes, ma'am.

5  Q.    Do you understand that?

6  A.    Uh-huh, yes.

7  Q.    And you would have to be willing to report any violations

8  of your son's conditions to Pretrial Services --

9  A.    Yes, ma'am.

10  Q.    -- to try to resolve that.  Do you understand that?

11  A.    Yes, ma'am.

12  Q.    The -- your son may be required, or it may be beneficial,

13  and we've talked about this, for him to participate in some

14  counseling.

15  A.    Yes, ma'am.  If he is released, the first thing that will

16  be done is an evaluation and counseling immediately.

17  Q.    And you have the ability to do that both financially

18  and --

19  A.    Yes, ma'am.

20  Q.    -- transportation wise?

21  A.    Yes, ma'am.  He has a lot of family support that if I'm

22  not able to, he also has his father, stepmother, and his other

23  brothers.  He has a lot of family support.

24  Q.    So his brother Joshua could be with him on those occasions

25  that you're at work if he needs somebody to keep an eye on him?

1   A.   Absolutely, absolutely.

2   Q.   And you could have location monitoring at your house?

3   A.   Absolutely.

4   Q.   You . . .

5            MS. BIRD:  I think that's all for now, Your Honor.

6            THE COURT:  All right.

7            MS. NOWALK:  May I inquire, Your Honor?

8            THE COURT:  You may.

9                        CROSS-EXAMINATION

10  BY MS. NOWALK:

11  Q.   Good morning.  You mentioned that you have a business at

12  home.  What kind of business at home do you have?

13  A.   It's candles.

14  Q.   (Inaudible.)

15  A.   (Inaudible) online to print my labels, that's all.

16  Q.   Okay.  And you say you do that like during the week and

17  then you're primarily working as a nurse on the weekend; is

18  that right?

19  A.   Yes.

20  Q.   And if you are only working as a nurse on the weekend and

21  you're not printing those labels from your computer at home,

22  would that be a financial disadvantage?

23  A.   I mean, I can hand write them.  I really don't care.

24  Q.   Okay.  But you do need your cell phone for work as a

25  nurse?

1    A.    Only with -- basically while I'm at work because I have to

2    communicate with doctors.   Frankly, Monday through Friday, I

3    could care less.

4          (Simultaneous speaking.)

5    Q.    I'm sorry.

6    A.    Because of my kids, if they need something.

7    Q.    So you need to have access because -- to a phone because

8    you have other children, right?

9    A.    As long as it's a land line and they can call a land line,

10   that's fine.

11   Q.    Okay.  And then your cell phone for work, even though you

12   may not need to access it except for on the weekend, you have

13   it in your possession, right?

14   A.    Right.

15   Q.    And your husband needs a phone for work, right?

16   A.    It is only needed for work, yes, because of his job.

17   Q.    And what does your husband do?

18   A.    He works at Walmart.

19   Q.    Okay.  Now, do you know if your son, Mr. -- or Matthew

20   Gahan, has a job?

21   A.    I'm sorry?

22   Q.    What does your son do for work?

23   A.    He's a full-time student right now.

24   Q.    Does he do clinicals at physical therapists' offices?

25   A.    Yes.

1  Q.    And how often does he go there?

2  A.    He's -- it's like a regular job Monday through Friday that

3  you don't get paid for.

4  Q.    What does he do for the physical therapist?

5  A.    Um, help me understand your question.

6  Q.    What does he do when he goes to work?

7  A.    He's learning how to help people that have had surgeries,

8  injuries, strokes, regain the use of their arms, legs, other

9  functions.

10 Q.    Do you know what kind of clients this physical therapist

11 has?

12 A.    Yes.  We live in The Villages.  They're all elderly.

13 Q.    Okay.  Do you know if they're restricted to a certain

14 demographic or if they're open to anyone?

15 A.    The place he's doing his clinicals, the next rotation was

16 Buffalo Crossing, which is a rehab facility.  And in all my

17 years of experience, they're older people, I guess.

18 Q.    Okay.  Did you know that in 2019 your son was dating a

19 14-year-old?

20 A.    We knew he was hanging out with him and they were

21 remodeling the house with the father.  And I had met the

22 father.  I had been to the house.  And there was not an issue

23 with the relationship as far as the father was concerned.

24        But when they started hanging out a little too much,

25 we did tell him that it doesn't look appropriate.  It could --

1  it -- being over the age of 18 and him not being at least 15,

2  16 -- I do believe I thought the boy was 15, because I told

3  him, you know, "Wait till he turns 16."

4  Q.    Okay.  So you believed the 14-year-old boyfriend was 15.

5  Is that right?

6  A.    Yes.

7  Q.    And you told your son -- who was an adult at the time; is

8  that right?

9  A.    He had just turned 18, I believe.  Somewhere in that area.

10 Q.    Was he 19 in 2019?

11 A.    I really don't know.

12 Q.    Okay.

13 A.    Not right this moment, but yeah.

14 Q.    What's your son's birthday?

15 A.    July 21st.

16 Q.    Of 1999?

17 A.    '99.

18 Q.    And this was June of 2019.  How old was your son?

19 A.    So, yeah, he would have been 19 --

20 Q.    Okay.

21 A.    -- but --

22 Q.    So you told your 19-year-old son to only date 16-year-olds

23 or older; is that right?

24 A.    Because that's the law.

25 Q.    Okay.  And you were aware, you said, that the father of

1  the child didn't have a problem with the relationship.  What

2  kind of relationship were the parents aware of?  Like did you

3  know that it was a romantic relationship?

4  A.   I suspected that, you know, he had a crush on the kid, but

5  that was about it.

6  Q.   Okay.  Did you ever see them engage in anything

7  physically?

8  A.   No, I did not.

9  Q.   Okay.  How long were they together?

10  A.   I honestly couldn't tell you.  I don't have a concept of

11  time.  A few months.

12  Q.   Okay.  Do you remember when you first learned about it?

13  A.   No.

14  Q.   Were you aware that the police were involved in an

15  incident involving your son and this child in 2019, June of

16  2019?

17  A.   No, I was not.

18  Q.   So you were never contacted for the facts related in that

19  incident report?

20  A.   No.  I didn't -- the father had never said anything to me

21  either.  The father knew where we lived and he had never said

22  anything.

23  Q.   Okay.  How long has your son been living with you?

24  A.   His whole life.

25  Q.   And so was he living with you in April of 2019?

1   A.    Yeah.

2   Q.    The first conversations that we have reflected in the

3   search warrant affidavit that I introduced as an exhibit on the

4   dark web were in April of 2019.  Did you know that your son was

5   doing this stuff online?

6   A.    No.  The only things I ever heard was him yelling at

7   people during gaming --

8   Q.    All right.

9   A.    -- you know.

10  Q.    Did you ever catch your son looking at or otherwise

11  accessing child pornography?

12  A.    We had seen the things the kids do on the wedgies, and at

13  that time I told him, "That is not appropriate.  It could

14  be" -- "if you're looking at it for entertainment purposes, if

15  you think it's funny, it could be taken the wrong way."

16  Q.    Did you see children's genitals exposed in those wedgies?

17  A.    I really don't remember.  I mean, I looked at it and I

18  took it and it was destroyed.

19  Q.    So your testimony is that you took whatever it was that he

20  had and destroyed it?

21  A.    Yes.

22  Q.    Okay.  And do you know about -- around October of 2019, is

23  that when that happened, or is that --

24  A.    I really don't know.

25  Q.    You don't know?

1    Did you know that October 12th, 2019, that your son

2  was talking to someone else on the dark web and said, quote,

3  "Haha, yeah, exactly, though, and I got caught by my mom weeks

4  ago when she checked a flash drive" --

5    MS. BIRD:  Your Honor, I'm going to object.  She

6  clearly wouldn't know that.  She already said she didn't -- she

7  wasn't aware of the time.

8    THE COURT:  You can proceed.  Overruled.

9    MS. NOWALK:  Okay.

10  BY MS. NOWALK:

11  Q.   Did you know if your child made this comment on the dark

12  web saying, quote, "I got caught by my mom weeks ago when she

13  checked a flash drive they weren't supposed to find when

14  snooping for some random-ass reason.  I was so dead-ass asleep

15  when she talked to me about it, I was basically shooing her out

16  the door and laying back down to go to bed.  LOL.  She didn't

17  get mad, but tried to scare me, saying how they're younger kids

18  and I could be in serious danger of being caught, et cetera.

19  But maybe some day they'll understand, because back in the day

20  they even made boy magazines and stuff.  Like I don't get why

21  stuff changed when stuff is so sexual today, especially social

22  media."

23    So is that the type of event that occurred for when

24  you found these wedgies that you just testified to?

25  A.   I'm sorry, I really didn't understand your question.

1   Q.   So he told someone on the dark web that people were

2   snooping for some reason and they found, on a flash drive,

3   child pornography.

4   A.   And you're asking if I knew that he said those things?

5   Q.   Is that what you found?

6   A.   It was the little wedgie things like I told you.

7   Q.   Okay.  You said you destroyed it.  How did you destroy it?

8   A.   I really don't remember.  I don't.

9   Q.   Do you know what device it was on?  Was it a flash drive?

10  A.   It was a USB.

11  Q.   Okay.  And then how did you -- you don't remember how you

12  destroyed it.  How did you confront your child about this?

13  A.   I discussed that it could be taken the wrong way.  And I

14  had also pointed out that he could get in trouble for it and

15  every image could be a separate charge.

16  Q.   Subsequent to this -- well, first, let me ask you, how did

17  you find this USB drive, this flash drive?

18  A.   I really don't remember, ma'am.

19  Q.   Okay.  So you don't remember, quote, snooping, as he

20  indicated to his friend that that's what was happening?  You

21  don't remember doing that?

22  A.   I may have been looking for a storage drive to put

23  something on, I really don't know.

24  Q.   Do you ever search your child's devices or otherwise

25  monitor what he's looking at online?

1    A.    No, ma'am.

2    Q.    Okay.  Subsequent to finding child pornography on a device

3    that your son was in possession of, did you ever look for child

4    pornography or monitor his devices or anything like that?

5    A.    No, ma'am.

6    Q.    Did you ever have any further conversations with him about

7    child pornography?

8    A.    I do not recall.

9    Q.    You mentioned that if he's released, he's going to go to

10   therapy immediately.

11   A.    Yes, ma'am.

12   Q.    What prompted that?

13   A.    Well, if the things are what, you know, you guys

14   indicated, then we need to find out what this is coming from

15   and try to fix the situation and help him work through wherever

16   he is at emotionally in life to get back on track.

17   Q.    And in 2019 -- around October 2019 when you found child

18   pornography, you -- did you suggest therapy at that time?

19   A.    I don't remember.

20            MS. NOWALK:  I have no further questions.

21            MS. BIRD:  May I, Your Honor?

22            THE COURT:  You can.

23                     REDIRECT EXAMINATION

24   BY MS. BIRD:

25   Q.    Ms. Mathis, you said that you could -- that you only

1   needed your cell phone for work, correct?

2   A.   Yes, ma'am.

3   Q.   And where do you work again?

4   A.   I work at a rehab.

5   Q.   Okay.  So could you leave your cell phone at work?

6   A.   No, because I'm only there two days a week and I -- I

7   would have no place to leave it.

8   Q.   Where could you secure your phone so that it wasn't at

9   your residence?

10  A.   Where could I?

11  Q.   Uh-hmm.

12  A.   I could take it to my other child's house or anybody

13  else's house.

14  Q.   And take it to work when you needed it?

15  A.   Yes.

16  Q.   And your husband, could he do the same thing?

17  A.   He has a locker at work.

18  Q.   Okay.  Okay.  So he could leave his phone in the locker at

19  work.  Okay.

20        And Matthew is your youngest son, correct?

21  A.   Yes, ma'am.

22  Q.   So you don't -- you wouldn't need the phone to monitor

23  kids in high school or school or anything like that?

24  A.   No, ma'am.

25  Q.   They're all adult, living adult lives, correct?

1  A.    Right.

2  Q.    The government asked you a lot of questions about

3  Matthew's work doing clinicals and what he does in that

4  program.

5        Is it your understanding that he's no longer in that

6  program due to the nature of this charge?

7  A.    Yes, ma'am.  He cannot continue the program until the case

8  is resolved.  And pending the adjudication of that case he may

9  not be able to get a license because in the state of Florida

10 there are certain statutes that bar you from getting a medical

11 or professional license.

12 Q.    And -- but your son has worked before in the fast-food

13 industry or different restaurants?

14 A.    Yes.

15 Q.    And he could also just remain at the house, correct?

16 A.    He can.  His father also owns a landscape business which

17 can put him to work.

18 Q.    The government talked to you about an incident that

19 happened in 2019 where you indicated you found some wedgies,

20 correct?

21 A.    Yes, ma'am.

22 Q.    And I believe in your testimony with the government you

23 indicated -- you said, "If it's a prank or something, there's a

24 problem.  If you just think it's funny, there's a problem."

25 What did you mean by that?

1   A.   I'm sorry.

2   Q.   When you were testifying earlier when the government asked

3   you questions, you -- you found the -- his flash drive that had

4   the wedgies and you were concerned, correct?

5   A.   Well, yeah, that it could be taken out of context and if

6   he's -- like -- I think at that point in time like the Jackass

7   movies and things were -- I just didn't want it to be taken the

8   wrong way or -- I don't know.  I mean --

9   Q.   Okay.  So at the time when you viewed it, it concerned

10   you, but you didn't necessarily think that your son was

11   intentionally looking at pornography?

12   A.   Correct.

13   Q.   Okay.  But even so, you warned him.  And how did you know

14   to warn him?  What happened in your personal life that made you

15   understand that with regard to where you're employed?

16   A.   There was other issues in the family in the past.

17   Q.   No, no, with regard to who you work with.  Somebody got

18   arrested?

19   A.   Oh, it was a story in the newspaper of somebody that had

20   been arrested that worked at the hospital.

21   Q.   That worked at the hospital?

22   A.   Yes.

23   Q.   Okay.  And that person was arrested and charged with

24   multiple counts for having depictions of a minor, correct?

25   A.   Yes.

1  Q.   Okay.  So you thought, okay, well, I need to counsel him

2  on this matter and tell him he should not have this, correct?

3  A.   Correct.

4  Q.   And then you removed it?

5  A.   Yes.

6  Q.   But you did not seek counseling for him at that point

7  because you weren't quite sure that that was intentional, or

8  you weren't sure that was his intentions?

9          MS. NOWALK:  Objection, leading.

10         THE COURT:  Okay.  Sorry, I was --

11  A.   I already had stated that previously.

12         THE COURT:  I didn't -- I didn't hear the question.

13         MS. BIRD:  Okay.  I'll restate it.

14         THE COURT:  That's what I was going to say.

15  BY MS. BIRD:

16  Q.   Why didn't you get your son counseling then at the time

17  you found the flash drive, or the thumb drive?

18  A.   I didn't think it was a serious enough issue that it

19  needed to be.

20  Q.   And is that because you weren't sure it was his intent to

21  view this pornography?

22  A.   Correct.

23         MS. BIRD:  All right.  I don't have anything further.

24         THE COURT:  You can step down.

25         Any further argument, Ms. Bird?

1       MS. BIRD:  No, Your Honor, just other than that the

2   allegations in this case are clearly serious, I understand

3   that, and I can understand why the Court might think overall

4   there's a potential danger here, but the Court also has to

5   consider if there's -- if there's safeguards that the Court

6   could take or recommendations it could follow that Pretrial

7   Services made that would assure the safety of the community and

8   the appearance of the defendant.  And they suggested travel

9   restricted to the Middle District of Florida.  The Court could

10  impose home detention and a monitor, refrain from

11  victim/witness contact.  Most of this was -- if he's at home

12  and detained and he has a third-party custodian he's not going

13  to have contact with anyone.  That can be a condition.

14      The firearms have been removed from the device

15  [verbatim].  There's no destructive devices or other dangerous

16  weapons.  The family's removed all the electronics.  They're

17  willing to live without wifi.  They have -- they can leave

18  their phones at the different -- at work or at different

19  houses.  There's absolutely no possibility of any kind of

20  contact with the devices.

21      The Court can impose a third-party custodian.  And

22  the Court can require specialized treatment, mental health

23  evaluation, and no contact with minors.

24      The client is not working right now.  The Court

25  could, you know, allow him to work with his father doing

1  landscaping, where he would be continuously monitored the whole

2  time, or could just require that he stay home and work on the

3  property or work in the house doing housework and so forth.

4      And obviously the Court can order that he not be

5  issued any travel documents.  He's got nowhere to go.  I mean,

6  this is his home; this is his family; this is all that he

7  knows.

8      So our argument is that although the Court might find

9  there is a danger here, there are conditions that would

10  reasonably assure his appearance and that the community would

11  remain safe.

12      THE COURT:  As an initial matter, I think the

13  government has established, as they did at the last hearing,

14  that there is a serious risk that the defendant would flee or

15  be a risk of flight.  I think they've also established a

16  serious risk that the defendant will obstruct or try to

17  obstruct justice.

18      In considering whether a bond should issue or not,

19  there is a preponderance of the evidence that the defendant

20  will be a risk of flight and clear and convincing evidence that

21  the defendant is a danger to the community.

22      I make those findings having considered the factors

23  set forth in Title 18 of United States Code 3142, including the

24  nature and the circumstances of the offense, which the

25  government recited in detail, along with the weight of the

1    evidence.  Both of those factors and subset of factors are

2    overwhelming in support of the finding.

3        The defendant does have family ties to the community.

4    He was pursuing school.  Certainly has a lengthy residence in

5    the community.  But those factors, while they weigh in favor of

6    the defendant, I would submit, are outweighed by the nature and

7    circumstances of the offense and the weight of the evidence.

8        There's such a substantial amount of information that

9    the government provided to consider, much of which comes from

10   the search warrant affidavit; the nature of the videos

11   themselves that were found; evidence of distribution, albeit

12   not yet charged, and perhaps maybe it won't be charged;

13   possible evidence of production; a substantial volume, over 600

14   images identified to date, 120 more identified from

15   communications and postings on the dark web; the defendant's

16   own statements related to distribution and production

17   identified from messaging he was engaged in; the list that the

18   government proffered, the list revealing clients and possible

19   dates of interactions and accomplishments or nature of

20   interaction that the defendant recorded; the evidence about his

21   involvement with a 14-year-old that's supported by his own

22   statements in communications he had on the dark web.

23       The defendant's mom may be well intended, but all the

24   information that was revealed both about the nature of the

25   conduct which would have occurred while living in the home

1   under some degree of supervision by his family, the fact that

2   potential child pornography was found by the parent, destroyed

3   by the parent, and that the defendant then talked about it with

4   people on the dark web all weigh against releasing the

5   defendant to a third-party custodian.

6            In terms of a potential obstruction and risk of

7   flight, the defendant is alleged to have been on a part of the

8   internet that's not easily accessible unless you download

9   certain software, have some knowledge of how to use that

10  software, and then are able to find websites that are otherwise

11  concealed.  You can't just type in "Dunkin' Donuts," for

12  example.  You have to have a code or a string of numbers or

13  letters to identify and find these particular websites.  That

14  the defendant was able to do it multiple times, the allegations

15  are at least four different websites; when one would be taken

16  down by law enforcement he would pop up on another one.  He

17  would come back online sometimes with the same user name,

18  sometimes with a different identity, oftentimes talking to some

19  of the same people, all talking about exchanging videos and

20  images.  Discussing how, as the government noted, to conceal

21  your identity while on the dark web; how to hide things by use

22  of a virtual machine, by use of certain email addresses.

23           After the first website went down a second one came

24  up and the defendant is reflected to have posted 247 posts to

25  that particular web site, including images, as the government

1  noted, with watermarks identifying -- potentially identifying

2  himself as the provider of those videos, perhaps as the

3  producer of those videos.  Those websites were taken down and

4  new websites came back up.  The defendant immediately began

5  posting on those websites, including, as mentioned, watermarked

6  wedgie-production videos.

7           I would submit for all of those reasons, as well as

8  those specifically addressed by the government, that the

9  defendant shall remain in custody and be remanded to the United

10 States Marshal pending final resolution of the case.

11          Ms. Bird, is there anything further to take up for

12 Mr. Gahan?

13          MS. BIRD:  I'm sorry, let me just ask one more

14 question.

15     (Pause in proceedings.)

16          MS. BIRD:  Nothing further.

17          THE COURT:  Ms. Nowalk?

18          MS. NOWALK:  No, Your Honor.

19          THE COURT:  All right.  We'll be in recess.

20          COURT SECURITY OFFICER:  All rise.

21     (Proceedings concluded at 2:49 p.m.)

22                            -    -    -

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2   UNITED STATES DISTRICT COURT)

3   MIDDLE DISTRICT OF FLORIDA )

4

5          I, court approved transcriber, certify that the

6   foregoing is a correct transcript from the official electronic

7   sound recording of the proceedings in the above-entitled

8   matter.

9

10          DATED this 13th day of November 2023.

11

12                          /s/ Katharine M. Healey
                            Katharine M. Healey, RMR, FPR-C
13                          Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25